IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CAROL FERGUSON and LYNDA FREEMAN, on behalf of themselves and, in addition, on behalf of others similarly situated, | Case No. 3:18-cv-00372-SB<br><br>**OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| MARIA SMITH, an individual; GLADSTONE AUTO, LLC, an Oregon limited liability company; and CARROS, INC., an Oregon corporation, | |
| Defendants. | |

**BECKERMAN, U.S. Magistrate Judge.**

The Court recently held jury and bench trials in this Fair Labor Standards Act ("FLSA")

collective action. The parties agree that in resolving the issues that were the subject of the bench

trial, the Court may consider all the testimony and evidence received during the jury trial, the

jury's verdict and findings, and the parties' pretrial and posttrial submissions to the Court.[1]

---

[1] The parties' positions are reflected in their posttrial submissions. (*See* Defs.' Proposed Findings Fact & Conclusions Law ("Defs.' Proposed F&C") at 1-6, ECF No. 261; Defs.' Mem. Supp. Proposed F&C ("Defs.' Mem.") at 1-8, ECF No. 262; Decl. Ian Maher ("Maher Decl.") ¶¶ 1-8, ECF No. 263; *id.* Exs. 1-7, ECF No. 263-1; Pls.' Proposed F&C at 1-11, ECF No. 264;

After reviewing the testimony and evidence, the jury's verdict and findings, and the parties' pretrial and posttrial submissions and arguments, the Court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure ("Rule") 52(a). *See Univ. Acct. Serv., LLC v. Schulton*, No. 3:18-cv-1486-SI, 2020 WL 2393856, at *1-2, *21 (D. Or. May 11, 2020) (taking the same approach in a mixed jury and bench trial and issuing an opinion and order setting forth the court's findings of fact and conclusions of law under Rule 52(a)). "Any finding of fact that constitutes a conclusion of law is adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is adopted as a finding of fact." *Id.* at *2.

## FINDINGS OF FACT

1.      On March 1, 2018, Plaintiffs Carol Ferguson ("Ferguson") and Lynda Freeman ("Freeman") (together, "Plaintiffs") filed this collective action against Defendants Maria Smith ("Smith") and Gladstone Auto, LLC and Carros, Inc., which respectively do business as Toyota of Gladstone and Mazda of Gladstone (together with Smith, "Defendants"). (Compl. at 1-9, ECF No. 1.) Plaintiffs asserted FLSA claims against Defendants based on their alleged failure to pay Plaintiffs, and the collective members, minimum wages and overtime by their regular payday. (*Id.* at 7-8.)

2.      At all relevant times, Smith owned Gladstone Auto, LLC ("Gladstone") and Carros, Inc. ("Carros"). (Jury Trial Tr. vol. 2, 302:13-303:15, May 2, 2023, ECF No. 258.) Gladstone operated as Toyota of Gladstone, and Carros operated as Mazda of Gladstone. (*Id.*) In November 2005, Smith purchased Toyota of Gladstone and adopted the same employee

---

Pls.' Mem. Supp. Proposed F&C ("Pls.' Mem.") at 1-12, ECF No. 265; Defs.' Resp. Pls.' Proposed F&C ("Defs.' Resp.") at 1-7, ECF No. 268; Pls.' Objs. Defs.' Proposed F&C ("Pls.' Objs.") at 1-12, ECF No. 269.)

handbook that she used at her Washington automobile dealerships, which she stated, without elaboration, "had been recommended, basically," and was "the standard handbook . . . provided by" the Washington State Auto Dealers Association ("WSADA"), the handbook that "pretty much" all Washington dealerships "were utilizing" and "follow[ed]," and the handbook Rick Lentini ("Lentini"), a Seattle-based labor and franchise law attorney, prepared for the WSADA.[2] (*Id.* at 307:21-310:4; Jury Trial Tr. vol. 1, 191:7-192:8.) Around the time she adopted this handbook at Toyota of Gladstone, Smith also "looked at" the "Oregon dealers association handbook," which was "[a] pretty similar . . . boilerplate-type manual." (Jury Trial Tr. vol. 1, 191:7-192:8.)

3.    The employee handbook included this payday policy: "Paychecks are distributed on the 10th and 25th of each month. If the scheduled day falls on a weekend or holiday, you will be paid on the preceding business day." (Jury Trial Tr. vol. 2, 297:18-21; *id.* at 310:11-20; Pls.' Trial Ex. 6.)

4.    In or around October 2006, after she trained Toyota of Gladstone's new general manager, David Elder ("Elder"), Smith changed the paydays to the 5th and 20th of each month

---

[2] Before trial, Defendants represented that (1) Smith planned to testify that her dealerships' long-time litigation and "regular labor and employment counsel," Robert Bekken ("Bekken"), who had recently withdrawn from this case, provided this employee handbook to Smith, who relied on it after having Lentini, who the WSADA "recommended to [Smith]," conduct an "additional review" regarding whether the handbook's policies were "legally compliant," and (2) Bekken planned to testify that he provided Smith with "a model handbook he had prepared for automobile dealers, which [Smith] had adapted for the 2005 handbook, and to his understanding [was also] reviewed by . . . Lentini," and that "a team of associates . . . knowledgeable in wage and hour requirements, including under the [FLSA]," assisted him in "developing the handbook . . . he provided to [Smith]." (Defs.' Revised Witness Statements at 2, 5-6, ECF No. 217; Notice Att'y Withdrawal at 1-2, ECF No. 215; Jury Trial Tr. vol. 1, 5:1-7; *id.* at 167:17, May 1, 2023, ECF No. 257; Defs.' Lay Witness List at 2, 5, ECF No. 195.) Bekken, however, did not testify at trial. (*See* Jury Trial Tr. vol. 1, 5:1-7; *see also* Trial Order Witnesses & Dep. Designations at 5, ECF No. 230.) Nor did Smith testify that Bekken or Lentini reviewed or provided this handbook.

because Elder had gained necessary payroll experience, she used the same paydays at her

Washington dealerships, and employees would receive their checks sooner. (*See* Jury Trial Tr.

vol. 2, 307:21-313:18; *id.* at 368:4-6; Jury Trial Tr. vol. 1, 193:15-22; *id.* at 201:17-202:14.)

Around the same time, Smith changed the policy regarding weekends and holidays: "If [the 5th

or 20th] fell on a Saturday, [payday] would be the day before. . . . If it fell on a Sunday, [payday]

would be the day after. . . . [Defendants] would [also] pay the day after the holiday." (*See* Jury

Trial Tr. vol. 2, 312:18-313:18; *id.* at 368:4-10; July Trial Tr. vol. 1, 193:15-22; *id.* at 202:9-

205:2.)

       5.     Smith, however, never updated the payday policy in the employee handbook,

which remained in effect until November 2017 and applied equally to the Mazda of Gladstone

dealership she purchased in 2012, and Defendants distributed the handbook to new hires at both

dealerships. (*See* Jury Trial Tr. vol. 2, 337:6-340:9; *id.* at 368:4-369:18; *id.* at 391:22-393:19;

Jury Trial Tr. vol. 1, 207:24-213:6.) Smith believes that she may have held a meeting fifteen or

twenty years ago to update Toyota of Gladstone's then-employees on the new paydays, but she

also stated that her dealerships have an "employee handbook so that if . . . an employee has a

question, they can look up . . . what the company policies are," and paydays in the handbook "are

the days that [her dealerships] definitely were paying." (Jury Trial Tr. vol. 2, 366:25-367:8; *id.* at

368:19-369:5.)

       6.     Smith did not ask any "attorneys if it was legal to depart from the paydays that

were listed in the handbook" because she did not "get any complaints." (*Id.* at 368:1-3.) Further,

Defendants did not have a lawyer they regularly consulted with respect to day-to-day business

issues unrelated to litigation; Smith is a member of the Oregon Auto Dealers Association

("OADA"), which makes "compliance assistance" available to its members, but she "never

[sought] it out" or attended meetings; and Defendants did not subscribe to any legal update publications. (Jury Trial Tr. vol. 1, 195:24-197:20.) Smith "rel[ies] more" on the WSADA, and "a CPA firm" that prepares Defendants' taxes and reports "when things go into effect." (*Id.* at 196:24-199:12.)

7.      Relatedly, Defendants' office manager, Angela Viol ("Viol"), reported that Defendants' human resources ("HR") and payroll representative, Laurie Park ("Park"), "handle[d] all" matters related to Defendants' efforts to stay updated on the law, she was not aware of any subscriptions, dealer association memberships, or newsletters that covered legal updates, and Defendants did not have a lawyer for non-litigation issues. (*Id.* at 187:4-191:4; *id.* at 165:5-168:13; *see also* Jury Trial Tr. vol. 2, 391:22-396:9, confirming that the dealerships share the same administrative department, which includes payroll, HR, and the office manager, Smith sets manager salaries, and Elder is also listed "on paper" as the general manager of Mazda of Gladstone.)

8.      Park took an accounting class in high school and a college accounting course in 2009, as well as courses that "specialized in payroll and payroll law and human resource[s]." (Jury Trial Tr. vol. 1, 166:9-24.) Additionally, Park, who started working for Smith in "HR or payroll" in 2004 and as Defendants' HR and payroll representative in 2009, stated that she completed five or six specialty courses "[m]ostly at the beginning" of her time working for Smith, the specialty courses took place in "a random building . . . through a company that [Park could not] remember . . . [and] didn't have their own building," and Smith paid for the courses. (*Id.* at 165:5-167:22.)

9.      Like Smith, Elder recalled that in or around October 2006, Smith changed the paydays to the 5th and 20th of each month and changed how the policy handled paydays that fell

on a weekend (i.e., if payday fell on a Saturday or Sunday, payday was Friday or Monday, respectively). (*Id.* at 201:10-205:2.) Elder described the holiday-related change differently than Smith did: "If a holiday interfered with the timely calculation and distribution of payroll, we'd pay the paycheck the first day—business day after the 5th or 20th." (*Id.*; *see also* Trial Tr. vol. 2, 313:14-15, "And what about if [payday] fell on a holiday? We would pay the day after the holiday.")

10.    Park described Defendants' payday policy similarly to Elder, but like Smith, also suggested that the 5th or 20th must fall on a holiday for Defendants' employees' payday to be the next day:

> Q. . . . [W]hat is the rule as to what the payday is for any given pay period? A.
> So . . . you get paid on the 5th . . . [or] on the 20th . . . *[u]nless it falls on a*
> *weekend or a holiday*. Then if . . . [payday] falls on Saturday, you get paid Friday.
> If it falls on Sunday, you get paid Monday. And if the holiday affects the payroll,
> then it's paid the following business day.

(Trial Tr. vol. 2, 186:5-14) (emphasis added). The policies in both of Defendants' handbooks likewise focused on whether the 5th or 20th "falls on" a holiday or weekend. (*See* Pls.' Trial Exs. 6-9.)

11.    According to Elder, the changes to the 5th and 20th and policy "pertain[ing] to weekends" were "set decision[s]," but "senior office staff, so . . . Park, . . . Viol, and . . . Smith," collectively made decisions about "holiday[s] impacting a . . . pay period" and the issuance of any "courtesy reminder two periods" beforehand if "there was going to be a variation." (Trial Tr. vol. 1, 204:19-206:7.) Smith and Viol recalled that Elder also participated. (*See id.* at 195:10-20, reflecting that Smith testified that Elder "pretty much act[ed] on his own" but he and Viol would call Smith based on Viol's "way in advance review" of the calendar and let her know if they were changing a payday and "sen[ding] out a notice" one "or two payroll periods prior"; *id.* at 189:14-190:9, showing that Viol testified that she and Elder (and occasionally Smith) decided

PAGE 6 – OPINION AND ORDER

when an upcoming pay date would be changed and that they considered various factors, such as

"how the weekend falls, how busy [they] are," if "banks are open," and "[h]ow many cars are

sold").

12.     At times, Defendants changed post-end of the month and holiday (i.e., high traffic

and sale time periods, in part due to manufacturer incentives and when customers often buy cars)

paydays that would have fallen on the 5th because many of their employees worked on graduated

or escalating commission schedules and received various sales-related bonuses, and they were

attempting to capture as many of their employees' sales and bonuses as possible. (*See* Jury Trial

Tr. vol. 2, 314:4-316:17; id. at 324:25-332:23; *id.* at 387:5-397:13; Jury Trial Tr. vol. 1, 192:21-

193:14.)

13.     Freeman and Ferguson provided varying testimony regarding Defendants' payday

policy during their periods of employment, which preceded Defendants' introduction of a new

employee handbook at their dealerships. (*See* Jury Trial Tr. vol. 1, 211:4-212:17; Jury Instrs. at

28, ECF No. 253.)

14.     For example, Freeman, who served as Defendants' showroom floor receptionist

from July 2012 to August 2017, testified that when she started working for Defendants, Park

provided her with the original handbook and told her that paydays were on the 5th and 20th of

each month and if a payday "fell on a weekend," Defendants would distribute employees'

paychecks "prior" to the weekend. (Jury Trial Tr. vol. 2, 252:1-18; *id.* at 253:2-255:14; *id.* at

265:18-266:5.)

15.     On cross-examination, Defendants' counsel asked Freeman whether she "just

testif[ied] that [Park] told [her during orientation] that if a payday . . . fell on a weekend *or*

*holiday*, that [employees] would be paid the day before," and Freeman stated, "yes[,] [t]hat's my

recall of what [Park] told me at the time." (*Id.* at 259:9-260:14) (emphasis added). After reviewing portions of her deposition testimony, Freeman confirmed that she previously testified that she could not "recall" what Park "said on holiday pay" and stated that she "believe[d]" her lack of recall was related to "the holiday" aspect of her conversation with Park. (*Id.* at 260:9-262:20.)

16.     When Defendants' counsel stated that Freeman "just testified that [she was] told that even on a holiday, [the payday] would be the prior day," Freeman confirmed that she did so. (*Id.* at 262:23-25.) Freeman also confirmed that during her deposition, Defendants' counsel asked if it was "correct" that Park "never told [her] one way or the other about the weekends or the holiday" during orientation, and she testified that she did not "recall . . . [Park] doing that." (*Id.* at 263:13-23; *id.* at 264:15-23.) In an attempt to clarify her testimony on these matters, Freeman stated that at least a portion of her deposition testimony in question concerned whether Park told her that Defendants would distribute paychecks the "next business day" if a payday fell on a holiday, not "whether [they] talked about [paydays that fell on a holiday] at all." (*Id.* at 274:24-276:3.)

17.     Additionally, Freeman testified that during her employment, she often received (and eventually expected to receive) her paycheck the "next business day" when payday fell on a Sunday or holiday; she occasionally received notices from Defendants that "payday would be changed" from the 5th to the 6th due to a holiday; she received such notices on her first paycheck and paychecks that preceded the January 6, 2016, July 6, 2016, July 6, 2017, and September 6, 2017 paydays; Defendants' employee handbook encouraged employees to raise questions or concerns with management; and she did not inform Park or dealership management that any of Defendants' payday practices were inconsistent with her understanding because she was worried

about losing a job she needed, given high employee turnover. (*Id.* at 255:14-24; *id.* at 264:25-274:19.)

18.    Similarly to Freeman, Ferguson, who worked as an administrative assistant and back-up receptionist for Defendants from November 2016 to July 2017, testified that on her first day of work, she met with Park, filled out various forms, and received Defendants' employee handbook; Park later informed her that paydays were on the 5th and 20th each month; she "was told [payday] would be the previous business day" if the 5th or 20th "fell on a weekend"; she was "[n]ot specifically" told anything about paydays that fell on a holiday but the employee handbook provided that "it would be the previous business day"; and she received notices about upcoming post-holiday paydays that Defendants changed to the 6th. (*Id.* at 276:7-22; *id.* at 277:8-280:10.)

19.    On cross-examination, Ferguson stated that she did not remember the exact words of a "fleeting conversation" with Park, which she "guess[ed]" took place "within a week" of her start date and after reading the employee handbook, but Park had told her that payday was on the 5th and 20th "unless it was a holiday," in which case payday would be "the weekday before, the Friday." (*Id.* at 282:9-286:7.) Ferguson added that if the payday fell on a weekend, she "assumed it would be the Friday before" but she did not "recall" what Park said about paydays that fell on a weekend. (*Id.* at 282:17-20.) Ferguson also testified that she later "understood" that when payday fell on a holiday, Defendants distributed paychecks after the holiday and provided notices before the payday, such as the notices that preceded the paydays that Defendants changed to July 6 and September 6, 2017. (*Id.* at 286:8-289:12.) Ferguson acknowledged that she did not follow up with Park with respect to whether she received inaccurate information regarding

Defendants' payday practices or express concern about Defendants' notices. (*Id.* at 286:16-289:16.)

20.     In November 2017, after Plaintiffs no longer worked for Defendants, Defendants distributed a new employee handbook, which Lentini prepared for Defendants with Smith's input. (*See id.* at 296:24-297:17; *id.* at 336:5-340:25; *id.* at 366:25-370:5; *id.* at 391:22-393:17; Pls.' Trial Ex. 7; Jury Trial Tr. vol. 1, 207:24-213:6; Jury Instrs. at 28.) The new handbook included the following payday policy: "Paychecks are distributed on the 5th and 20th of each month [and] cover the previous pay period. If a payday falls on a holiday or weekend, your paycheck will normally be available the next workday." (Pls.' Trial Ex. 7; Jury Trial Tr. vol. 2, 297:13-17.)

21.     On May 3, 2023, after the parties presented their evidence and testimony and rested their cases, the Court submitted agreed-upon portions of the case to the jury. (*See* ECF Nos. 244, 247-48, 256, reciting the minutes of the trial). In accordance with the parties' agreement, the Court asked the jury to address: (1) whether Defendants failed to pay Plaintiffs and the collective members by their regular payday, and if so, whether Defendants willfully failed to do so; and (2) whether certain collective members were exempt from the FLSA's requirements as highly compensated employees or salesmen, partsmen, or mechanics primarily engaged in selling or servicing automobiles. (Jury Instrs. at 4, 25-26; Verdict Form at 2-5, ECF No. 250.)

22.     The jury determined that on four occasions (i.e., January 6 and July 6, 2016 and July 6 and September 6, 2017), Defendants failed (but did not willfully fail) to pay Plaintiffs and the collective members by their regular payday. (Verdict Form at 2-3.) In other words, the jury determined that on Wednesday, January 6, 2016, Wednesday, July 6, 2016, Thursday, July 6,

2017, and Wednesday, September 6, 2017, four instances in which Defendants' regular payday on the 5th did not fall on a weekend or holiday, Defendants failed to pay Plaintiffs and the collective members by their regular payday. (*See* Pls.' Trial Ex. 12 at 2-3; Maher Decl. Ex. 6 at 2-3.)

23.    The verdict is consistent with the jury assigning more weight to the testimony and evidence showing that (1) between March 2015 (three years before Plaintiffs filed this lawsuit) and Defendants' introduction of the new handbook in November 2017, Defendants' policy was to pay by the 5th or 20th (instead of the 10th and 25th) unless payday fell on a Saturday, Sunday, on a holiday, in which case Defendants paid by the preceding Friday, next Monday, or next workday, respectively (as opposed to the preceding business day in all instances); and (2) after the new handbook went into effect, Defendants' policy was to pay by the 5th or 20th unless payday fell on a holiday or weekend, in which case Defendants regularly paid by the next workday.

24.    With respect to exemptions, the jury found that the six collective members at issue were highly compensated employees and seven out of the seventeen collective members at issue were salesmen, partsmen, or mechanics primarily engaged in selling or servicing automobiles, and as a consequence, were not subject to the FLSA's requirements. (Verdict Form at 4-5.)

25.    On May 4, 2023, the Court held a bench a trial on liquidated damages and Defendants' related defenses, all of which depended in part on the jury trial record and jury's verdict. (*See* Bench Trial Tr. 5:11-9:12, May 4, 2023, ECF No. 260, discussing the bench trial's scope.)

///

26.     At the start of the bench trial, the parties reported that they had reached an agreement on two liquidated damages calculations, both of which were set forth in a spreadsheet that Defendants' payroll witness, Drew Voth ("Voth"), a certified public accountant, prepared. (*Id.* at 5:11-8:23.) Specifically, the parties stipulated on the record to Voth's determinations that given the jury's verdict and findings, there would be "$98,116.63 in minimum wage liquidated damages and . . . $1,568.40 in overtime hours liquidated damages." (*Id.* at 6:20-8:23.)

27.     The parties also reported that Voth's liquidated damages calculations appropriately accounted for the jury's verdict and findings regarding any of the collective members' exempt or non-exempt status and the fact that only three of Defendants' four non-willful FLSA violations (i.e., July 6, 2016 and July 6 and September 6, 2017) fell within the FLSA's standard and applicable "two-year statute of limitations."[3] (*Id.*) The parties acknowledged that given the absence of a willful violation, there would be "no damages" associated with the January 6, 2016 payday. (*Id.*)

28.     Based on their stipulation regarding Voth's liquidated damages calculations, the parties explained that the bench trial could be limited to the "value" or "amount" of any potential liquidated damages award stemming from the straight time portion of the non-exempt collective members' overtime on the "three [relevant] paydays," and Defendants' "good faith defenses" to a liquidated damages award and the "jury trial record" related thereto. (*Id.* at 5:20-6:1; *id.* at 8:9-8:23.)

29.     With respect to potential "straight time overtime liquidated damages," Plaintiff called Jennifer Murphy ("Murphy"), a certified public accountant, to testify on the matter. (*Id.* at

---

[3] "If a particular employer's conduct embodies [a] willful violation of [the] FLSA, 29 U.S.C. § 255(a) permits extension of the FLSA's standard two-year statute of limitations to a three-year period." *Standorf v. Out W. Ventures, Inc.*, No. 22-15060, 2022 WL 17984020, at *2 (9th Cir. Dec. 29, 2022) (quoting *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003)).

5:20-22; *id.* at 9:14-17:7.) Murphy testified that "for each impacted employee who . . . was found

to be non-exempt and potentially eligible for the overtime liquidated damages," she

"summarized" the "pay period at issue, [the employee's] regular hours and regular pay for that

pay period, . . . [the employee's] overtime hours for that particular pay period," and the

employee's "straight time pay" for the pay period given the "regular hours" and "regular pay."

(*Id.* at 11:10-23.) Murphy further testified that she "add[ed] [the straight time pay] for each pay

period and each impacted employee during the period, [and] the total [was] $20,707.30 for the

group," and thus $20,707.30 is the total for the "straight pay portion of the overtime liquidated

damages." (*Id.* at 11:24-12:13.)

30.     At the close of direct examination, the Court admitted the necessary portions of

Murphy's PowerPoint presentation (pages six and seven) into evidence without objection. (*Id.* at

12:14-13:5.) After Defendants' brief cross-examination of Murphy, the bench trial concluded.

(*Id.* at 13:10-17:13.)

31.     On May 25 and June 27, 2023, the parties submitted their proposed findings of

fact and conclusions of law and memoranda in support, and response briefs. (ECF Nos. 261-65,

268-69.) Consistent with their discussions with the Court, the parties' posttrial submissions

focused on two issues: (1) whether, given the jury trial record, Defendants successfully

established a good faith defense to liquidated damages under the FLSA; and (2) whether

Plaintiffs' claim for straight time liquidated damages is a legally viable theory. (*See id.*; Bench

Trial Tr. 5:20-6:1; *id.* at 8:19-23.)

## CONCLUSIONS OF LAW

### I.    JURISDICTION AND LIABILITY

1.     The Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), and all

parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636. (ECF No.

161, consent; Answer ¶¶ 2-3, ECF No. 20, venue is proper and there is jurisdiction under the FLSA and § 1331.)

2.      At all relevant times, there was FLSA coverage and Defendants were subject to the FLSA's minimum wage and overtime requirements. *See Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 914-16 (9th Cir. 2003) (discussing FLSA enterprise coverage in a case where two companies were under the common control of the same individual defendant, engaged in related activities, shared a common business purpose, constituted a single enterprise, and were both subject to the FLSA's rules, even though only one company satisfied enterprise coverage's revenue requirement, i.e., an employer that was enterprise engaged in interstate commerce with an "annual gross revenue of $500,000 or greater" (quoting 29 U.S.C. §§ 203(r)(1) and 203(s))); 29 U.S.C. § 206(a) (minimum wage); *id.* § 207(a)(1) (overtime); (*see also* Jury Trial Tr. vol. 2, 292:3-10, *id.* at 370:6-15, reflecting that counsel did not believe that the parties disputed FLSA coverage requirements and Smith testified that each of the dealerships she controlled sold more than $500,000 worth of cars each year and had at least two employees selling goods in interstate commerce).

3.      The evidence adduced at trial supported the Court's past decisions and demonstrated that for purposes of the FLSA, Defendants were joint employers of the collective members, and the Court has personal jurisdiction over Defendants. *See Ferguson v. Smith*, No. 3:18-cv-00372-SB, 2018 WL 3733665, at *2-6 (D. Or. July 18, 2018) (recommending that the district judge deny a motion to dismiss Smith for lack of personal jurisdiction), *findings and recommendation adopted*, 2018 WL 3732657, at *1 (D. Or. Aug. 6, 2018); *Ferguson v. Smith*, No. 3:18-cv-00372-SB, 2020 WL 5731821, at *2-6 (D. Or. Aug. 12, 2020), *findings and recommendation adopted*, 2020 WL 6112186, at *1-4 (D. Or. Oct. 16, 2020) (adopting without

objection the Court's finding that Plaintiffs presented sufficient evidence that Smith's Oregon dealerships were joint employers); *Ferguson v. Smith*, No. 3:18-cv-00372-SB, 2021 WL 5203152, at *8-9 (D. Or. May 21, 2021) ("Smith was well-positioned to ensure compliance with the FLSA and . . . Smith's actions and decisions can be traced directly to the alleged FLSA violations in this case. The Court therefore concludes that Plaintiffs have presented sufficient evidence to establish that Smith meets the FLSA's expansive definition of employer based on her role and level of control."), *findings and recommendation adopted*, 2021 WL 4330851, at *1-5 (D. Or. Sept. 23, 2021).

     4.    On three occasions within the FLSA's applicable two-year statute of limitations, July 6, 2016 and July 6 and September 6, 2017, Defendants failed to pay all wages due to Plaintiffs and the collective members by their regular payday. (Verdict Form at 2-3; Bench Trial Tr. 6:20-8:23; Jury Instrs. at 22.) As a result, Defendants violated the FLSA. *See Biggs v. Wilson*, 1 F.3d 1537, 1538 (9th Cir. 1993) (observing that the state paid "wages 14-15 days late because there was no state budget, and thus no funds appropriated for the payment of salaries, on payday," agreeing with the district court that "granted a summary judgment declaring that the failure to issue paychecks promptly when due violated the FLSA," and holding that "under the FLSA wages are 'unpaid' unless they are paid on the employees' regular payday"); *see also Standorf*, 2022 WL 17984020, at *2 (explaining that "[a] cause of action for unpaid wages under FLSA accrues each 'day the employee's paycheck is normally issued, but isn't'" (quoting *Biggs*, 1 F.3d at 1540)).

///

///

///

## II.    LIQUIDATED DAMAGES

### A.    Good Faith Defense

#### 1.    Applicable Law

5.    It is well settled that "successful FLSA plaintiffs," such as Freeman, Ferguson, and the other collective members, are entitled to liquidated damages. *See Haro v. City of L.A.*, 745 F.3d 1249, 1259 (9th Cir. 2014) (observing that "successful FLSA plaintiffs are entitled to liquidated damages"). That is true even in cases like this one, where the jury determined that Defendants did not willfully violate the FLSA. *See Alvarez*, 339 F.3d at 910 ("[Even] [a] finding that the employer did not act willfully does not preclude an award of liquidated damages.") (citation omitted).

6.    Although successful FLSA plaintiffs are entitled to liquidated damages, the FLSA provides that a court "need not award liquidated damages in every instance[.]"*Alvarez*, 339 F.3d at 909. If an employer successfully makes out a "good faith defense" under 29 U.S.C. § 260, *see Walsh v. Wellfleet Commc'ns*, No. 20-16385, 2021 WL 4796537, at *2 (9th Cir. Oct. 14, 2021) (stating that § 260 sets forth the "FLSA good faith defense" to liquidated damages), a court retains the discretion to "award no liquidated damages" or "award less" than the amount the FLSA requires. *See Alvarez*, 339 F.3d at 909 (noting that if the employer establishes a good faith defense, "courts retain discretion to withhold a liquidated damages award, or to award less than the statutory liquidated damages total, . . . despite the failure [timely] to pay appropriate wages"); *Flores v. City of San Gabriel*, 824 F.3d 890, 905 (9th Cir. 2016) (recognizing that if the employer establishes a good faith defense, courts retain the "discretion" to "award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216") (simplified).

///

PAGE 16 – OPINION AND ORDER

### a.    The Employer's Burden

7.    The employer bears the burden of establishing both the subjective and objective components of the good faith defense against liquidated damages. *See Alvarez*, 339 F.3d at 909-10 (explaining that "a FLSA-liable employer" bears the burden of satisfying the "subjective" and "objective" components of the good faith defense under § 260). To satisfy the subjective component, "the employer must 'establish that it had an honest intention to ascertain and follow the dictates of the [FLSA].'" *Flores*, 824 F.3d at 905 (quoting *Local 246 Util. Workers Union of Am. v. S. Cal. Edison Co.*, 83 F.3d 292, 298 (9th Cir. 1996)). To satisfy the objective component, the employer must establish that it had "reasonable grounds for believing that [its] conduct complie[d] with the [FLSA]." *Id.* (quoting *Local 246*, 83 F.3d at 298). If the employer fails to establish either component, liquidated damages are mandatory. *See Haro*, 745 F.3d at 1259 (explaining that if the employer does not meet its burden of "proving both" the subjective and objective components, liquidated damages are "mandatory" (citing *Alvarez*, 339 F.3d at 909-10)).

### b.    Relevant Circuit Caselaw

8.    In past decisions, the Ninth Circuit has referred to liquidated or "double" damages (i.e., additional damages equal to unpaid minimum wages and/or overtime compensation, *see Flores*, 824 F.3d at 904-05 (citing 29 U.S.C. § 216(b))) as "the norm" and an award of no liquidated damages or "single damages" as the "exception," and to an employer's "difficult" and "heavy" burden of proving both the subjective and objective components of a good faith defense under § 260. *See Haro*, 745 F.3d at 1259 ("Double damages are the norm; single damages are the exception. Liquidated damages are 'mandatory' unless the employer can overcome the 'difficult' burden of proving both subjective 'good faith' and objectively 'reasonable grounds' for believing that it was not violating the FLSA." (citing *Chao*, 346 F.3d at 919-20 and quoting *Alvarez*, 339

F.3d at 909-10)); *Flores*, 824 F.3d at 890 (referring to "§ 260's heavy burden" (citing *Alvarez*, 339 F.3d at 910)).

9.       In a recent, albeit divided, decision, the Ninth Circuit observed that "[a] review of [its] cases addressing willfulness and the assessment of liquidated damages under the FLSA reflect that a determination of willfulness and the assessment of liquidated damages are reserved for the most recalcitrant violators." *Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*, 52 F.4th 843, 851 (9th Cir. 2022) (per curiam), *cert. denied*, --- S. Ct. ---- , 2023 WL 3937617, at *1 (U.S. June 12, 2023). In support of this observation and its conclusion that the defendant did "not belong in th[is] group of recalcitrant employers," the Ninth Circuit cited *Alvarez*'s observations that courts "will not presume that conduct was willful in the absence of evidence" and "need not award liquidated damages in every instance," and *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1072 (9th Cir. 1990), which "not[ed] that the [good faith defense there] was not one 'like many of those cited by the [e]mployees, where the employer [was] using ticky-tack reasons to attempt to evade the wage and hour laws.'" *Ray*, 52 F.4th at 851 (quoting *Alvarez*, 339 F.3d at 909-10 and *Bratt*, 912 F.2d at 1072).

10.       In support of its holding that the district court in *Ray* "did not err in granting partial summary judgment to the [defendant] on the issue of willfulness and denying partial summary judgment to [the plaintiff] on the issue of liquidated damages," the Ninth Circuit emphasized that it was "undisputed that the [defendant] [c]ounty had no ability to pay overtime wages in the absence of the [s]tate making funds available to satisfy the overtime obligations" at issue, that the defendant "had no authority or ability to implement overtime pay" for in-home support services program workers like the plaintiff, and that a state department, not the defendant, controlled the relevant payroll systems, which were on a "centralized . . . state-wide

database." *Id.* at 851-52 (simplified). The Ninth Circuit explained that "[t]he facts of [the *Ray*]

case [were] more akin to [cases] declining to impose a willfulness penalty on the employer in the

absence of an affirmative refusal to comply with the requirements of the FLSA." *Id.* at 852. The

Ninth Circuit cited *Bratt* as an example of such a case, noting that *Bratt* reasoned that there was

no evidence that the defendant "attempted to evade its responsibility under the [FLSA]," the

defendant's decision was "more likely" made in good faith because it was "made above board

and justified in public," and "liquidated damages 'are designed in part to compensate for

concealed violations, which may [otherwise] escape scrutiny.'" *Id.* (quoting *Bratt*, 912 F.2d at

1072).

11.    The Ninth Circuit also explained that the facts in *Ray* were "in stark contrast to

those in *Alvarez*, in which [the Ninth Circuit] upheld the district court's determination of 'willful

conduct.'" *Id.* (quoting *Alvarez*, 339 F.3d at 909). The Ninth Circuit noted that in *Alvarez*, the

defendant "took no affirmative action to assure compliance with [the FLSA's requirements],"

"attempt[ed] to evade compliance, or to minimize the actions necessary to achieve compliance,"

and "'could easily have inquired into . . . the type of steps necessary to comply' with the

provisions of the FLSA, but failed to do so." *Id.* (quoting *Alvarez*, 339 F.3d at 909). By contrast,

in *Ray,* there was "no evidence . . . that the [defendant] 'attempt[ed] to evade compliance, or to

minimize the actions necessary to achieve compliance' with the overtime provisions of the

FLSA," and the record instead "reflect[ed] that the only reason that the [defendant] failed to pay

the required overtime wages sooner [was] because the [s]tate controlled the purse strings." *Id.*

(quoting *Alvarez*, 339 F.3d at 909). For these reasons, the Ninth Circuit affirmed "the district

court's decisions granting partial summary judgment to the [defendant] on the issue of

willfulness and denying partial summary judgment to [the plaintiff] on the issue of liquidated damages[.]" *Id.*

12.     Judge Berzon dissented from the majority's willfulness and liquidated damages holdings in *Ray*. *See id.* at 852-58. Judge Berzon stated that she would have reversed both of the district court's decisions because, "[a]lthough the result the majority reache[d] on liquidated damages and willfulness may seem equitable, it [was] not consistent with the standards [the *Ray* court was] obligated to apply under the [FLSA]." *Id.* at 853. With respect to liquidated damages, Judge Berzon explained that the plaintiff was entitled to partial summary judgment because the defendant fell short of overcoming the "difficult" burden of proving both of the good faith defense's components. *Id.* (quoting *Haro*, 745 F.3d at 1259). Judge Berzon further explained that the majority's "starting premise"—that "the assessment of liquidated damages [is] reserved for the most recalcitrant of violators"—was "just wrong." *Id.* In support, Judge Berzon noted that liquidated or double damages are the norm and "represent compensation . . . , not a penalty," and that "single damages are the exception." *Id.* (quoting *Chao*, 346 F.3d at 920). Judge Berzon rejected the suggestion that the defendant showed subjective good faith, simply because "complying with the FLSA was difficult and took time, and the [s]tate and [c]ounty implemented overtime pay as quickly as they could." *Id.* at 854. Judge Berzon added that, in her view, "the majority's liquidated damages discussion d[id] not address th[e] essential [objective] prong at all." *Id.* at 855.

### 2.     Application of Law to Fact

13.     The Court concludes that Defendants have failed to meet their burden of proving both the subjective and objective components of their good faith defense, and therefore Plaintiffs and the collective members are entitled to liquidated damages. *See Haro*, 745 F.3d at 1259

(explaining that liquidated damages are "mandatory" unless the employer carries its burden of proving both components).

14.    "To avail itself of [a good faith] defense, the employer must establish that it had an honest intention to ascertain and follow the dictates of the [FLSA] and that it had reasonable grounds for believing that its conduct complied with the [FLSA]." *Flores*, 824 F.3d at 905 (simplified). The Ninth Circuit's decision in *Flores* is an illustrative example of how and when an employer fails to meet its burden of proving the subjective and objective components of its good faith defense.

15.    In *Flores*, the plaintiffs, who were current and former city police officers, alleged that the city violated the FLSA by failing to "include payments of unused portions of the [plaintiffs'] benefits allowances when calculating their regular rate of pay, resulting in a lower overtime rate and a consequent underpayment of overtime compensation." *Id.* at 894-95. To establish its good faith defense, the defendant relied exclusively on its payroll department employee's testimony. *Id.* at 905. The employee's testimony focused on the "[c]ity's process for determining whether a particular payment must be included in the regular rate of pay," and how the "[c]ity's payroll and [HR] departments work[ed] together to determine whether a particular type of payment should be included in the calculation of the regular rate of pay when the payment [was] first provided." *Id.* Although the employee testified that the HR "department notifies the payroll department if it learn[ed] of new authority concerning the classification of a payment," the city conducted "no further review of a payment's designation" post-initial classification and thus the cash-in-lieu of benefits payments at issue had "never been included in the calculation of the regular rate of pay." *Id.*

///

PAGE 21 – OPINION AND ORDER

16.     In reversing the district court and holding that the plaintiffs were entitled to liquidated damages and entry of judgment in their favor, the Ninth Circuit explained that the city's "paltry evidence [was] not sufficient to carry the [c]ity's burden to demonstrate that it acted in good faith." *Id.* In so holding, the Ninth Circuit emphasized that the city's evidence needed (but failed) to address "what steps the [HR] department took to determine that the cash-in-lieu of benefits payments were appropriately classified as a 'benefit' under the FLSA and excluded from the calculation of the regular rate of pay," and "*how* either [the HR or payroll] department[s] determined that the payment's designation as a 'benefit' complied with the FLSA." *Id.* The Ninth Circuit also emphasized that contrary to the city's argument, "[e]vidence that the [c]ity complied with its other obligations under the [FLSA,] or that it agreed to pay overtime more generously than required by law[,] d[id] not demonstrate what [it had] done to ascertain whether its classification of the payments at issue . . . complied with the FLSA." *Id.* at 906. After recognizing that "[a]n employer 'who fail[s] to take the steps necessary to ensure [its] . . . practices complied with the [FLSA]' and who 'offers no evidence to show that it *actively endeavored* to ensure such compliance' has not satisfied [its burden under] § 260," the Ninth Circuit held that the city failed to meet its burden and, therefore, the plaintiffs were entitled to liquidated damages and entry of judgment. *Id.* at 905-06 (quoting *Alvarez*, 339 F.3d at 910).

17.     Defendants' evidence is likewise insufficient to carry its burden under § 260. Similar to the evidence in *Flores*, Defendants' evidence fails adequately to address what they did or steps they took to ascertain whether, at all relevant times, their ad hoc decisions to pay after the regular payday and issue a notice complied with the FLSA, or how they arrived at such a conclusion. As discussed below, much of Defendants' evidence amounts to ex post explanations

and justifications. *See Alvarez*, 339 F.3d at 910 ("Mistaking ex post explanation and justification

for the necessary affirmative 'steps' to ensure compliance, [the defendant] offers no evidence to

show that it actively endeavored to ensure such compliance. Instead, it reiterates the value of its

read of [an unhelpful Tenth Circuit case], of [an agency's] litigation strategy[, which is different

than rulings or interpretations], and of [a] four-minute compliance plan. [These] efforts do not

constitute evidence of taking the steps necessary to ensure FLSA compliance, and, without such

evidence, we cannot say that the district court abused its discretion in awarding liquidated

damages."); *see also id.* (noting that non-willful violations do not preclude awarding liquidated

damages) (citation omitted).

18.     Defendants argue that their good faith and honest intention to ascertain what the

FLSA required is demonstrated by "the fact that [Park] took payroll law courses and Defendants

received legal updates from automobile associations and their accounting firm," and the jury's

finding that Defendants did not commit any willful violations of the FLSA. (Defs.' Mem. at 6.)

The Court disagrees.

19.     Park's testimony suggests that her "payroll law" and HR classes preceded the

time period and payday-related decisions in question by many years, and fails to reflect that these

courses had anything to do with the decisions underlying the FLSA claims Plaintiffs presented

here. (*See* Jury Trial Tr. vol. 1, 165:5-167:22; *id.* at 166:9-24, showing that Park took an

accounting class in high school and a college accounting course in 2009, as well as courses that

"specialized in payroll and payroll law and human resource[s]," Park started working for Smith

in "HR or payroll" in 2004 and as Defendants' payroll and HR representative in 2009, Park

completed five or six specialty courses "[m]ostly at the beginning" of her time working for

Smith, the specialty courses took place in "a random building . . . through a company that [Park

could not] remember . . . [and] didn't have their own building," and Smith paid for Park's specialty courses).

20.     The same is true with respect to Defendants' evidence related to legal guidance. In 2005, Smith adopted the same employee handbook that she used at her Washington dealerships, which she stated, without explanation, "had been recommended, basically," and referred to as "the standard handbook . . . provided by" the WSADA, the handbook that "most" and "pretty much" all Washington dealerships "were utilizing" and "follow[ed]," and the handbook Lentini prepared for the WSADA. (Jury Trial Tr. vol. 2, 307:21-310:4; Jury Trial Tr. vol. 1, 191:7-192:8.) Smith also "looked at" the OADA handbook, which was a "pretty similar . . . boilerplate-type manual." (Jury Trial Tr. vol. 1, 191:7-192:8.) As relevant here, however, Defendants later adopted, and made ad hoc decisions to deviate from, an unwritten payday policy that differed from the initial handbook; failed to update their written policy, or consult an attorney with respect to their practices and deviations from their regular paydays, until 2017; and for many years, distributed the old written policy to new hires at both dealerships. (*See* Jury Trial Tr. vol. 2, 297:18-21; *id.* at 307:21-313:18; *id.* at 314:4-316:17; *id.* at 324:25-332:23; *id.* at 337:6-340:9; *id.* at 368:4-369:18; *id.* at 387:5-397:13; Jury Trial Tr. vol. 1, 187:4-191:4; *id.* at 192:21-193:14-22; *id.* at 195:10-197:20; *id.* at 201:17-206:7; *id.* at 207:24-213:6; Pls.' Trial Exs. 6-9; Verdict Form at 2-3.)

21.     Despite these facts, Smith stated that her dealerships have an "employee handbook so that if . . . an employee has a question, they can look up . . . what the company policies are," the handbook paydays "are the days that [her dealerships] definitely were paying," and she did not ask any "attorneys if it was legal to depart from the paydays that were listed in the handbook" because she did not "get any complaints." (Jury Trial Tr. vol. 2, 366:25-367:8; *id.*

PAGE 24 – OPINION AND ORDER

at 368:1-369:5.) Smith added that she "rel[ies] more" on the WSADA, and "a CPA firm" that prepares Defendants' taxes and reports "when things go into effect." (Jury Trial Tr. vol. 1, 196:24-199:12.)

22.    A lack of employee complaints does not address what Defendants did to ascertain whether their unwritten practices (which differed from the original WSADA handbook an attorney prepared and predated Lentini's preparation of, and consultation regarding, a new handbook in 2017), and deviations therefrom, complied with the FLSA. Nor does it obviate the need to do so. There are valid, non-legal, and not unexpected reasons why an employee might not complain about payday policies. (*See* Jury Trial Tr. vol. 2, 256:19-22; *id.* at 274:8-19, "Was there any reason you didn't complain about these late paychecks? A. Well, I was worried about losing my job [as a single mom with two kids living in a rental]. I didn't want to upset anybody, because . . . I needed that job. Q. Was there anything that you observed about the business that would lead you to think that you wouldn't get a fair hearing [given the] open door policy [in the initial handbook]? A. We just had a lot of turnover there, just a lot of turnover. The people were in and out regularly. And I was just in a place in my life that I needed to be employed and I couldn't afford to possibly lose my job at that time.") Further, general references to Smith's reliance on the WSADA and a CPA firm fail to demonstrate that Defendants attempted to ascertain whether the conduct at issue complied with the FLSA, and Smith's testimony in fact suggests that neither source weighed in on FLSA compliance either generally or specifically with respect to the payday issue here.

23.    On the issue of willfulness, the Court finds unpersuasive Defendants' reliance on the jury's finding that Plaintiffs failed to demonstrate that Defendants willfully failed to pay all wages due by the regular payday. (*See* Defs.' Mem. at 7; Verdict Form at 2-3.) A willfulness

finding defeats a good faith defense. *See Haro*, 745 F.3d at 1258-59 (stating that "[t]he facts outlined in [the decision] showing willfulness . . . also show[ed] a lack of good faith or reasonable grounds under § 216(b)," and "thus affirm[ing] the district court's grant of liquidated damages"); *Chao*, 346 F.3d at 920 (noting that "good faith is plainly inconsistent with a finding of willfulness" and "the contrapositive, that a finding of good faith precludes a finding of willfulness" (citing *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1130 (9th Cir. 2002))). But non-willful does not necessarily mean good faith. *See Alvarez*, 339 F.3d at 910 ("[A] finding that the employer did not act willfully does not preclude an award of liquidated damages.") (citation omitted); *Helton v. Factor 5, Inc.*, 26 F. Supp. 3d 913, 923 n.9 (N.D. Cal. 2014) (noting that good faith "requires more than ignorance of the prevailing law or uncertainty about its development; it requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them" (citing *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997))).

24.    As the Court instructed the jury (*see* Jury Instrs. at 23), a FLSA violation is "willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA," and "merely negligent conduct will not suffice." *Flores*, 824 F.3d at 906 (simplified). By comparison, a good faith defense depends on whether the defendant presented sufficient evidence regarding the active steps it took to ascertain whether the challenged conduct complied with the FLSA and whether it had reasonable grounds for believing it complied. To be sure, in *Flores*, the Ninth Circuit held that an employer does not meet its burden by failing to "take the steps necessary to ensure its practices complied with FLSA" and offering "no evidence to show that it *actively endeavored* to ensure such compliance," noted that it had previously affirmed "an award of liquidated damages where the employer believed [it

complied] . . . , but had failed to consult an objective authority or seek advice on the legality of its position," and added the defendant "[g]rasp[ed] at straws" and "miss[ed] the mark" in arguing good faith based on "its inclusion of other types of payments in the regular rate of pay and its payment of overtime more generously than the FLSA requires," none of which addressed what it had "done to ascertain whether its classification of the payments at issue [i.e., the unused cash-in-lieu of benefit payments excluded from regular rates and resulting in lower overtime rates] complied with the FLSA." *Id.* at 895, 905-06 (simplified).

25.     Defendants also argue that their good faith and honest intention to ascertain what the FLSA required is demonstrated by the fact that the "pre-2017 handbook payday policy was . . . implemented in an above board and open manner that was fully disclosed to employees," and based, in part, on their desire to pay employees earlier than the 10th and 25th and capture the most sales for graduated commission schedule purposes. (Defs.' Mem. at 6-7, citing, *inter alia*, *Bratt*, 912 F.2d at 1072.) These reasons fail adequately to demonstrate that Defendants have satisfied their burden under § 260. *See Flores*, 824 F.3d at 906 (stating that evidence that the defendant "agreed to pay overtime more generously than required by law d[id] not demonstrate what the [defendant] ha[d] done to ascertain whether [the conduct the plaintiffs challenged] complied with the FLSA"); *see also Alvarez*, 339 F.3d at 910 ("Mistaking ex post explanation and justification for the necessary affirmative 'steps' to ensure compliance, [defendant] offers no evidence to show that it actively endeavored to ensure such compliance. . . . [W]ithout such evidence, we cannot say that the district court abused its discretion in awarding liquidated damages.").

26.     With respect to Defendants' reliance on *Bratt*, it is true that the Ninth Circuit has observed that "'a decision made above board and justified in public' . . . 'is more likely' made in

good faith." *Ray*, 52 F.4th at 852 (citing *Bratt*, 912 F.2d at 1072). However, neither *Bratt* nor *Ray* is sufficiently similar to assist Defendants here.

27.    In *Bratt*, the defendant county's decision concerned whether employees were exempt from FLSA coverage and the county's "incorrect" and "not unreasonable" interpretation of supporting regulations, which did "not specifically address" the type of employees at issue but whose duties "reasonably could be construed as analogous to those of [certain employees] cited in the regulations as examples of exempt employees." 912 F.2d at 1072. The defendant assigned an individual who "arguably was adequately qualified" to "make [such] coverage decisions . . . , and his decisions whether to make more extensive studies of individual jobs and corresponding data involved practical considerations on how best to complete the required evaluations in a timely fashion." *Id.* The Ninth Circuit held that the district court did not abuse its discretion in refusing to award liquidated damages, noting that the above facts showed that the defendant had an honest intention to comply with the FLSA and reasonable grounds for believing it had done so. *Id.*

28.    *Ray* involved the U.S. Department of Labor's ("DOL") issuance of a new rule, which entitled certain workers to overtime pay under the FLSA. 52 F.4th at 845. A district court vacated the rule before its effective date, the D.C. Circuit later reversed the district court and upheld the rule, and the state, which jointly employed the workers at issue, decided to begin paying overtime wages a few months after the D.C. Circuit's mandate. *Id.* In affirming the district court's denial of partial summary judgment to the plaintiff on the issue of liquidated damages, the Ninth Circuit noted that it was "undisputed that resolution of the overtime wages for [the workers] played out in public, including numerous training sessions on implementing the new FLSA requirement," and that *Bratt* supported the district court's determination that the

defendant acted in good faith under the circumstances. *Id.* at 852. The Ninth Circuit also noted

"the record reflect[ed] that the only reason [the defendant] failed to pay the required overtime

wages sooner [was] because the [s]tate controlled the purse strings," i.e., a state department

controlled the relevant payroll systems, which were on a "centralized . . . state-wide database."

*Id.* at 851-52.

29.    Unlike *Ray*, this case does not involve any new rule or law, and Defendants

always had and controlled the funds necessary to satisfy their obligations. (*See* Jury Trial Tr. vol.

1 195:21-196:4, reflecting that Smith confirmed as much; *id.* at 15:25-16:1, arguing that this case

is "a judicially-created situation" stemming from the Ninth Circuit's decision in "the *Biggs*

case"); *see also Biggs*, 1 F.3d at 1538 (recognizing that the state paid "wages 14-15 days late

because there was no state budget, and thus no funds appropriated for the payment of salaries, on

payday," agreeing with the district court that "granted a summary judgment declaring that the

failure to issue paychecks promptly when due violated the FLSA," and holding that "under the

FLSA wages are 'unpaid' unless they are paid on the employees' regular payday"); *Standorf*,

2022 WL 17984020, at *2 (explaining that "[a] cause of action for unpaid wages under FLSA

accrues each 'day the employee's paycheck is normally issued, but isn't'" (quoting *Biggs*, 1 F.3d

at 1540)).

30.    This case is also distinguishable from *Bratt* because Defendants do not claim or

present evidence demonstrating that during the relevant time period and with respect to the

decisions underlying the FLSA violations the jury identified, Defendants attempted to interpret,

or assess their compliance with, the FLSA, or made an incorrect, but "not unreasonable,"

decision related thereto. Defendants' good faith defense appears to be based, in part, on an

argument that conflicts with the jury's verdict. (*See* Defs.' Mem. at 7-8, arguing that Defendants

had "objectively reasonable grounds for believing the three paydays at issue did not violate the FLSA," and stating "Defendants [in fact] complied with their [regular] payday policy as the July 6, 2016, July 6, 2017, and September 6, 2017 paydays were affected by intervening weekends and holidays on July 4th in 2016 and 2017 and Labor Day in 2017 such that there were only two business days after the 1st prior to the payday"; *see also* Verdict Form at 2-3, finding that on these dates, "Plaintiffs prove[d] by a preponderance of the evidence that Defendants failed to pay all wages due by the regular payday"; Jury Trial Tr. vol. 2, 313:14-15, "And what about if it fell on a holiday? We would pay the day after the holiday."; Jury Trial Tr. vol. 1, 186:5-14, "[W]hat [was] the rule as to what the payday is for any given pay period? . . . [Y]ou get paid on the 5th . . . [or] on the 20th . . . [u]nless it falls on a weekend or a holiday."; Pls.' Trial Exs. 6-9, reciting payday policies based on whether the payday "falls on a weekend or holiday" or "falls on a holiday or weekend").

31.    With respect to the objective component of their defense, Defendants cite a decision from this district, *Allison v. Dolich*, 148 F. Supp. 3d 1142, 1156 (D. Or. 2015), for the proposition that the "FLSA allows employers to have a payday policy by which a holiday delays the payday." (Defs.' Mem. at 7.) Nothing in the record demonstrates that Defendants relied on *Allison* during the relevant time period. Furthermore, the paydays in *Allison* were the 5th and 20th and the allegedly late paychecks from within the statute of limitations were February 21, 2012 (i.e., payday fell on President's Day and comported with the defendants' policy that "a holiday delayed the checks by a day") and September 23, 2011, a date "inconsistent" with the defendants' uncontroverted evidence that "September 20, 2011 [was the] check date in the payroll register." 148 F. Supp. 3d at 1156. *Allison* does not support Defendants' position, as the jury assigned more weight to evidence showing that during the period at issue, their policy was

to pay on the 5th or the 20th unless payday fell on a holiday, in which case they would "pay the day after the holiday." (*See* Jury Trial Tr. vol. 2, 313:14-15, "And what about if it fell on a holiday? We would pay the day after the holiday."; Jury Trial Tr. vol. 2, 186:5-14, "[W]hat [was] the rule as to what the payday is for any given pay period? . . . [Y]ou get paid on the 5th . . . [or] on the 20th . . . [u]nless it falls on a weekend or a holiday."; Pls.' Trial Exs. 6-9, reciting policies about whether the payday "falls on a weekend or holiday" or "falls on a holiday or weekend"). The jury did not credit or assign more weight to evidence suggesting that holiday-related interference with payroll and notice was part of Defendants' regular payday, or find that Defendants complied with the FLSA with respect to the three paydays in question.

32.    In summary, Defendants have failed adequately to demonstrate that they took the steps necessary to ensure that their challenged practices complied with the FLSA and offered no evidence that they actively endeavored to ensure such compliance. *See Solis v. R.M. Int'l, Inc.*, No. 3:09-cv-0863-BR, 2012 WL 1445575, at *3 (D. Or. Apr. 26, 2012) (stating that the defendants had not met their burden, ex-post explanations and justifications are insufficient, there was "not any direct evidence as to the purpose" of defense counsel's representation, it was "fair to infer that [the defendants'] counsel was hired to ensure [their] compliance with [related, non-FLSA] regulations rather than to ensure [they] were compliant with FLSA," and "[i]n any event, there [was] not any evidence on [the] record from which the [court could] find that [they] took the steps necessary to ensure its practices complied with FLSA") (simplified). Consequently, Defendants have failed to satisfy their burden of proving a good faith defense under § 260, and Plaintiffs and the collective members are entitled to the following stipulated amounts of liquidated damages:

///

| Employee | Minimum Wage Liquidated Damages | Overtime Hours Liquidated Damages |
|---|---|---|
| Aaron Waxenfelter | $1,805.40 | $0.00 |
| Benjamin Phillip Doan | $703.03 | $0.00 |
| Braden Allard | $768.94 | $0.00 |
| Bryan Dowd | $1,118.60 | $0.00 |
| Camille Abu Khzam | $2,292.16 | $0.00 |
| Carlos Barrera | $2,297.68 | $0.00 |
| Carmen Lukowski | $2,614.72 | $0.00 |
| Carol Ferguson | $635.83 | $25.68 |
| Chai Xiong | $1,460.01 | $0.00 |
| Christopher Popp | $1,706.58 | $0.00 |
| Colton Gledhill | $1,511.92 | $0.00 |
| Daniel Hernandez | $2,120.34 | $0.00 |
| Dereck Messer | $2,133.60 | $0.00 |
| Domonique Stewart | $1,916.10 | $0.00 |
| Dustin Franke | $3,566.63 | $0.00 |
| Eric Blaha | $2,257.87 | $0.00 |
| Erma L. Gonzales | $874.50 | $0.00 |
| Freddy Garcia | $1,614.72 | $0.00 |
| Gabriel Gasca | $1,867.60 | $305.17 |
| Gayle Wilson | $1,729.64 | $0.00 |
| Hugo Aguirre Najera | $659.03 | $338.63 |

PAGE 32 – OPINION AND ORDER

| Employee | Minimum Wage Liquidated Damages | Overtime Hours Liquidated Damages |
|---|---|---|
| Ignacio Ortiz Sanchez | $1,881.39 | $36.90 |
| Jai Xiong | $1,361.85 | $0.00 |
| James Dailey | $2,263.09 | $0.00 |
| Jeffrey Potter II | $35.16 | $0.00 |
| Jeffrey R. Karlin | $2,981.28 | $0.00 |
| Jeffrey S. Karlin | $2,651.26 | $0.00 |
| Jeremy Colen | $2,856.29 | $0.00 |
| Jeremy Ovalle | $2,408.02 | $0.00 |
| Jordan Martine | $1,596.89 | $0.00 |
| Joseph Pietila | $1,848.03 | $0.00 |
| Joshua Lemus | $2,407.08 | $0.00 |
| Kevin Wyatt | $685.49 | $0.00 |
| Linda Kay Landrum | $657.65 | $0.00 |
| Lynda Freeman | $1,156.38 | $86.67 |
| Lynn Sanchez | $2,705.20 | $0.00 |
| Manuel Vargas | $2,506.40 | $0.00 |
| Mckenzie Heeley | $716.23 | $0.00 |
| Michael Schmitt | $663.59 | $0.00 |
| Mohssen Fooladjoush | $1,619.94 | $0.00 |
| Nannette Lackey | $1,784.24 | $4.20 |
| Nicholas A. Niemeyer | $3,051.90 | $0.00 |

| Employee | Minimum Wage Liquidated Damages | Overtime Hours Liquidated Damages |
|---|---|---|
| Nue Xiong | $1,610.38 | $0.00 |
| Patrick Bliss | $1,620.89 | $0.00 |
| Phouthaleth Kittirath | $1,778.14 | $0.00 |
| Raymond G. Gonzales | $352.13 | $0.00 |
| Reymundo Vargas-Martinez | $98.38 | $0.00 |
| Richie Flores | $1,519.60 | $135.90 |
| Robert Baker | $2,018.11 | $0.00 |
| Robert Utley | $782.13 | $0.00 |
| Ryan Patershall | $900.74 | $0.00 |
| Sandy Wayne Smith | $642.35 | $537.75 |
| Sergio Polanco Dominguez | $1,992.30 | $91.50 |
| Stafford Grindy | $2,013.04 | $0.00 |
| Steven Welborn | $663.59 | $0.00 |
| Tavish Winscott | $645.25 | $6.00 |
| Taylor Willis | $1,734.86 | $0.00 |
| Tyler Vaughn | $2,422.81 | $0.00 |
| Wesley Kennedy | $777.71 | $0.00 |
| You Tsuruta | $729.42 | $0.00 |
| Zachary McClure | $1,553.60 | $0.00 |
| Zachery Rangel | $768.94 | $0.00 |
| **Total** | **$98,116.63** | **$1,568.40** |

(*See* Pls.' Proposed F&C at 4-5, providing the same table based on the parties' stipulation to Voth's calculations; Defs.' Proposed F&C at 4, noting the stipulation to the relevant totals listed above.)

### B.    Straight Time

33.    The remaining issue for the Court to address is the parties' dispute as to whether Plaintiffs' claim for straight time liquidated damages is a legally viable theory. (*See* Pls.' Mem. at 8-10; Defs.' Mem. at 3-6; Pls.' Objs. at 10-12; Defs.' Resp. at 5-7; Bench Trial Tr. 5:20-6:1; *id.* at 8:19-23.)

34.    The FLSA provides that "[a]n employer who violates [its provisions] 'shall be liable to the employee or employees affected in the amount of their *unpaid minimum wages*, or their *unpaid overtime compensation*, as the case may be, and in an additional *equal amount* as liquidated damages.'" *Flores*, 824 F.3d at 904-05 (emphasis added) (quoting 29 U.S.C. § 216(b)); *see also* 29 U.S.C. § 207(a)(1) (prohibiting employment "for a workweek longer than forty hours unless [the] employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed").

35.    The Supreme Court has observed that the FLSA's liquidated damages provision, 29 U.S.C. § 216(b), addresses issues related to recovery for "retention of a workman's pay, which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages," and reflects that Congress had "seen fit to fix" and "enumerat[e] the sums recoverable" thereunder. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707-09, 715-16 (1945) (citations omitted). On its face, the FLSA's liquidated damages provision characterizes such damages to an "equal amount" of "unpaid minimum wages" and/or "unpaid overtime

compensation." *See* 29 U.S.C. § 216(b) (referring to liquidated damages as amounts equal to such wages).

36.     Notably, however, there are "situations . . . that fall between" the FLSA's federal minimum wage and overtime provisions. *See Conner v. Cleveland Cnty., N.C.*, 22 F.4th 412, 420-21 (4th Cir. 2022) (discussing 29 U.S.C. §§ 206(a)(1) and 207(a)(1)). Specifically, "[i]n addition to seeking unpaid overtime compensation, employees may seek to recover wages for uncompensated hours worked that 'fall between the minimum wage and the overtime provisions of the FLSA,' otherwise known as 'gap time.'" *Id.* at 421 (quoting *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 244 (3d Cir. 2014), which quoted *Adair v. City of Kirkland*, 185 F.3d 1055, 1062 (9th Cir. 1999)). "Gap time" means time that is not directly covered by the FLSA's "overtime provisions because it does not exceed the overtime limit," and "minimum wage provisions because . . . the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked." *Adair*, 185 F.3d at 1062 n.6; *Conner*, 22 F.4th at 421.

37.     There are two types of gap time claims: (1) "pure gap time," i.e., "the employee seeks to recover for unpaid straight time in a week in which they worked no overtime," and (2) "overtime gap time," i.e., "the employee seeks to recover unpaid straight time for a week in which they *did* work overtime." *Conner*, 22 F.4th at 421. Although "direct minimum wage and overtime violations can clearly be addressed by the FLSA, 29 U.S.C. §§ 206-207, no provision of the FLSA explicitly governs employee claims to recover for unpaid gap time." *Id.* As explained in *Conner*, courts, including the Fourth Circuit, "widely agree" that "there is no cause of action under the FLSA for *pure* gap time when there is no evidence of a minimum wage or maximum hour violation by the employer," but courts "are divided on whether an employee can

bring an overtime gap time claim for unpaid straight time worked in an overtime week." *Id.*

(quoting *Monahan v. Cnty. of Chesterfield*, 95 F.3d 1263, 1280 (4th Cir. 1996) and *Davis*, 765

F.3d at 244).

38.     In *Adair*, the Ninth Circuit concluded that the plaintiffs were not entitled to

overtime given the applicability of an exemption from the FLSA's normal overtime limit and did

not reach the plaintiffs' alternative claim for "gap time" related to "uncompensated hours worked

that f[e]ll between the minimum wage and the overtime provisions of the FLSA," but noted that

it was "not clear that a gap time claim may be asserted under the FLSA[.]" 185 F.3d at 1058-62

n.6 (citing, *inter alia*, *Monahan*, 95 F.3d at 1282); *see also Monahan*, 95 F.3d at 1282

(disagreeing with any "authority that implies claims for pure gap time, straight time when no

overtime has been worked, are cognizable under the FLSA when the employer has not violated

the FLSA's minimum wage/maximum hour provisions," and questioning whether "even the most

liberal interpretation [of the FLSA] can encompass such claims" given "the legislative history

and intent behind [it]" (citing, *inter alia*, *Donovan v. Crisostomo*, 689 F.2d 869, 872 & n.3 (9th

Cir. 1982)).

39.     Courts in this circuit have noted that the Ninth Circuit has not addressed whether

gap time claims are viable under the FLSA, and adopted the majority position discussed in

*Conner* that there is no cause of action under the FLSA for pure gap time claims. *See Kouchi v.*

*Am. Airlines, Inc.*, No. 18-cv-7802, 2019 WL 994011, at *2-3 (C.D. Cal. Jan. 23, 2019)

(observing that the defendant "correctly note[d]" that the "Ninth Circuit has not yet weighed in"

on whether "pure gap time claims are cognizable under the FLSA," stating that the "majority

position," including for "most district courts in this circuit," is that there is no cause of action

under the FLSA for pure gap time, adopting the majority position, and dismissing a pure gap

time); *Young v. Beard*, No. 2:11-cv-02491, 2015 WL 1021278, at *12 (E.D. Cal. Mar. 9, 2015) (stating that "the Ninth Circuit has not resolved whether a plaintiff may bring 'gap time' claims under the FLSA" and "[m]any circuits do not allow pure gap time claims brought under the FLSA," and adopting the "majority position" (citing *Adair*, 185 F.3d at 1062 n.6 and *Donovan*, 689 F.2d at 876)).

40.     Plaintiffs' liquidated damages theory is based on overtime (not pure) gap time, as they seek to recover liquidated damages in amounts equal to unpaid straight time in weeks in which they worked overtime. (*See* Pls.' Mem. at 8-9, addressing "liquidated damages for straight-time hours worked in overtime weeks," and stating that "there can be no 'gap time' claim in a non-overtime week"). Plaintiffs' "basic case" in support is based on the Ninth Circuit's decision in *Donovan* and 29 C.F.R. § 778.315, a DOL regulation on which *Donovan* relied and provides interpretative guidance on the FLSA's overtime provision. (*See* Pls.' Mem. at 8-12, focusing on *Donovan* and this regulation, with background quotes from *Adair* on "gap time"; Pls.' Objs. at 10-12, stating that Plaintiffs' "basic case" is set forth in their memorandum.)

41.     The DOL "provides an official interpretation of the FLSA overtime provisions in part 778 of the Code of Federal Regulations, title 29," such as § 778.315, which is titled "[p]ayment for all hours worked in overtime workweek is required" and provides, in relevant part, that the "extra compensation for the excess hours of overtime work under the [FLSA] cannot be said to have been paid to an employee unless all the straight time compensation due him for the nonovertime hours under his contract (express or implied) or under any applicable statute has been paid." *Conner*, 22 F.4th at 421-22 (citing 29 C.F.R. § 778.1(a) and quoting 29 C.F.R. § 778.315).

///

42.     In *Donovan*, the DOL Secretary sued an employer under the FLSA because its employees worked overtime but were not compensated for doing so, and were required to "kickback" part of their straight time wages, which caused them to receive "$.38 an hour less" than their agreed-upon hourly rate and the amounts listed on payroll, but not "less than the minimum wage specified in the FLSA." 689 F.2d at 871-72 & n.3. The district court concluded that the employer violated the FLSA's overtime provision by "failing to compensate their employees at a rate of at least one and one half times the employees' regular hourly rate for all hours worked over 40 in each workweek," and awarded actual damages and an equal amount of liquidated damages, which accounted for "[f]ifteen dollars for each overtime workweek . . . to allow restitution for the amount of straight time compensation that had been kicked back." *Id.* at 872 & n.4. The district court "ordered no restitution for kickbacks in non-overtime weeks." *Id.* at 872 n.3.

43.     On appeal, the Ninth Circuit addressed whether the DOL Secretary had "authority under the FLSA to sue for restitution of the kickbacks taken from the employees' wages and [whether] the district court [was able to] award damages for underpayment of straight time wages under the FLSA." *Id.* at 873. The Ninth Circuit noted that "[i]n the weeks when no overtime was worked," the DOL Secretary "had no authority to seek restitution of the kickbacks as part of unpaid overtime compensation," where the "kickbacks did not result in the employees receiving less than the minimum wage specified in the FLSA." *Id.* at 873 n.2. The Ninth Circuit, however, held that the DOL Secretary could "seek restitution for kickbacks from straight time wages as overtime compensation for those weeks in which overtime [was] worked." *Id.* at 876. In support, the Ninth Circuit emphasized that (1) "[i]f an employer were permitted to take kickbacks from straight time pay during overtime weeks, the [FLSA's overtime provision's]

purpose . . . to spread work and . . . provide for the strain of long hours by making overtime work more expensive would be circumvented," (2) "an employer could effectively eliminate the premium paid for overtime by taking kickbacks out of straight time wages in an amount equal to or greater than the overtime premium," and (3) a contrary holding "would allow employers to frustrate the policy of [the FLSA's overtime provision] through the use of kickbacks." *Id.* Further, the Ninth Circuit emphasized that the DOL Secretary has "interpreted the [FLSA's] overtime provision as requiring full payment for all straight time hours worked as a prerequisite to satisfying the overtime provision[,]" noted that its holding recognized that the DOL Secretary's interpretation of "the statute he administers [was] entitled to deference," and rejected the argument that "the kickback issue was not pleaded and should not be considered" because "kickbacks were an integral part of the overtime violation and required no additional pleading." *Id.* at 876 & n.13-14 (citing 29 C.F.R. § 778.315).

44. Defendants argue that there is "no basis in law" for Plaintiffs' "novel" straight time liquidated damages theory. (Defs.' Mem. at 4-5.) In Defendants' view, the "plain text" of the liquidated damages provision, 29 U.S.C. § 216(b), precludes liquidated damages for gap time in overtime weeks, "numerous courts have found liquidated damages in the amount of [gap] time pay are not available under the FLSA," and Plaintiffs fail to "identify any authority that *liquidated damages* can be assessed for [gap] time wages that were *fully paid* but slightly delayed and for which advance notice was given." (Defs.' Mem. at 3-5) (emphasis altered). Defendants add that this Court has previously supported their view. (*Id.* at 3, 5, quoting ECF No. 170 at 2-3.)

45. The Court rejects Defendants' argument for several reasons. First, the cases Defendants cite are merely persuasive decisions that do not address the Ninth Circuit's *Donovan*

decision, or the circumstances and precise theory that Plaintiffs present here. *See Ming Hui v. Shorty's Seafood Corp.*, No. 15-7295, 2017 WL 5054401, at *8 (E.D.N.Y. Sept. 6, 2017) (finding that a New York statute allowed an employee to recover all unpaid wages, including "straight time compensation," and the "FLSA provides for liquidated damages in the amount of actual damages for just unpaid minimum wage and overtime compensation," and focusing on whether the plaintiff could "stack" liquidated damages under both statutes), *report and recommendation adopted*, 2017 WL 5125527, at *1 (E.D.N.Y. Nov. 2, 2017); *Koelker v. Mayor & City Council of Cumberland (Md.)*, 599 F. Supp. 2d 624, 638 n.18 (D. Md. 2009) (declining to award liquidated damages based on a good faith defense, and stating in a footnote that "[e]ven if liquidated damages were warranted in this case, liquidated damages would apply only to the award of FLSA overtime; the straight time compensation awarded for gap hours is not subject to liquidated damages"); *Hernandez v. Martinez*, No. 12-6133, 2014 WL 3962647, at *12 (N.D. Cal. Aug. 13, 2014) (explaining that the employee "could have accrued overtime despite working less than 40 regular weekly hours by working more than eight hours a day" given that state law "mandate[d] overtime for 'work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek,'" the "FLSA awards overtime only for a workweek longer than forty hours," and the employee was "entitled to FLSA liquidated damages only for hours beyond 40 in a given week," not "the number of regular hours less than 40 that were worked") (simplified).

46.     Defendants do not address Plaintiffs' claim that "*Donovan* specifically and explicitly awarded liquidated damages for unpaid straight time in overtime weeks" and "[t]his Court should do the same" (Pls.' Objs. at 11), other than to note this case is "solely for *late* pay" and does not involve "overtime gap time," "failure to pay any straight time," or "kickbacks from

straight time wages" like *Donovan*, which is "a far cry from the situation here where employees were fully paid but slightly delayed and for which advance notice was given." (Defs.' Resp. at 5-6) (emphasis altered). However, the jury determined here that Defendants violated the FLSA, even if their FLSA violation was of a different character than in *Donovan*. Furthermore, some courts and commentators appear to have endorsed Plaintiffs' position on overtime gap time. *See* Hannah Schoeb, Comment, *Bridging the Gap: Overtime Gap Time under the Fair Labor Standards Act*, 66 Kan. L. Rev. 603, 603-05 & n. a1-3, 617-24 (2018) (thanking the attorneys at the DOL solicitor's local office, stating that "overtime gap time" was illustrated by a hypothetical where the employee worked more than forty hours but was only credited for thirty-five and still earned an hourly rate greater than the federal minimum wage, noting that three circuits "have implicitly or explicitly considered overtime gap time" and "no clear consensus has emerged," and *Donovan* "considered an issue nearly identical to overtime gap time" and "used reasoning that illuminates the current overtime gap time inquiry, and set the stage for the cases that would follow").

47.    Notably, in *Conner*, a case Defendants cite (Defs.' Mem. at 5), the Fourth Circuit reviewed the DOL's interpretative guidance given the FLSA's silence regarding overtime gap time, and stated that the gap overtime related interpretation, 29 C.F.R. § 778.315, "made sense" in light of the "policy objective" underlying the FLSA's overtime provision. 22 F.4th at 422. In support, *Conner* cited *Donovan*:

> [In *Donovan*, the Ninth Circuit found] a violation of the FLSA's overtime provisions and frustration of its objectives when an employer, in a scheme similar in effect to overtime gap time violations, required its employees to pay a cash 'kickback' to the employer during overtime weeks, resulting in a reduction in the employees' regular rate of pay compared to the employment agreement.

*Id.* (quoting *Donovan*, 689 F.2d at 876). The Fourth Circuit also explained that § 778.315 supported the conclusion that "an employee must be compensated at the agreed-upon or regular

straight-time rate (rather than the statutory minimum wage rate) before any computation for overtime." *Id.* Relying on § 778.315's guidance, as in *Donovan*, the Fourth Circuit held that overtime gap time claims are cognizable under the FLSA, thus resolving "any doubt" about its position. *Id.* at 424.

48.    Defendants suggest that *Conner* supports their view that § 778.315 "does not say that overtime wages include the straight time pay for all regular hours worked" or "anything about how liquidated damages are calculated," and has merely "been interpreted as precluding an employer from reducing regular pay to offset overtime compensation owed." (Defs.' Mem. at 4-5.) With respect to the latter proposition, Defendants cite the following example that *Conner* provided:

> For example, assume an employee's salary is $1,500 each work week for straight-time wages, and in a given work week, the employee earns $750 in overtime pay. Instead of issuing the employee a paycheck for $2,250, the employer issues a paycheck in the amount of $1,750. The paystub designates a payment of $1,000 as 'salary' and $750 as 'overtime compensation.' In this scenario, there is a violation of the overtime provisions of the FLSA according to § 778.315 because it is improper to designate $750 as 'overtime pay' without first having paid all straight-time wages. Effectively, the employer has only paid the employee $250 in overtime pay out of the $750 owed.

22 F.4th at 422-23 (footnote omitted).

49.    In *Conner*, the Fourth Circuit recognized that gap time can include nonpayment for a period of time, or underpayment, based on the "gap between what is promised to be paid as an employee's regular salary and what is actually paid," nothing in § 778.315 "suggests a difference between *under*payment and *non*payment of straight time wages," and "*all* [straight time] means all," and proceeded to expand on its previous example in discussing how there are multiple types of overtime gap time:

> In a previous example, we assumed an employer owed their employee $1,500 in straight-time wages and $750 in overtime wages; however, the employer only paid a total of $1,750, designating $1,000 as straight-time wages and $750 as

PAGE 43 – OPINION AND ORDER

overtime. In this example, there is not a direct lack of payment for a period of *time*, so the gap is not precisely the same as the one in [a past case]. Instead, the 'gap' is the $500 owed for straight-time wages, effectively meaning the employee has been paid for only 2/3 of their straight time worked ($1,000 out of $1,500). Because overtime 'cannot be said to have been paid . . . unless all the straight time' is paid, 29 C.F.R. § 778.315, we would deem the first $500 of the overtime payment to be straight-time wages in order to fill that gap. That would, in turn, create an underpayment of overtime and, thus, an overtime violation under the FLSA.

*Id.* at 424-25.

50.     The Fourth Circuit's decision is instructive and supports Plaintiffs' reliance on *Donovan*. Plaintiffs are entitled to liquidated damages in an "equal amount" to "unpaid minimum wages" and "unpaid overtime compensation." 29 U.S.C. § 216(b). The DOL's interpretative guidance addresses "overtime compensation" and provides that the "extra compensation for the excess hours of overtime work under the [FLSA] cannot be said to have been paid to an employee unless *all* the straight time compensation due him for the nonovertime hours under his contract (express or implied) or under any applicable statute has been paid." 29 C.F.R. § 778.315 (emphasis added). For an employer to meet its overtime obligations, "an employee must be compensated at the agreed-upon or regular straight-time rate (rather than the statutory minimum wage rate) before any computation for overtime." *Conner*, 22 F.4th at 422. This regular straight-time rate may be "obvious" from the parties' compensation arrangement and regular pay practices. *Id.* at 427.

51.     Given these authorities, it would be improper to limit any overtime week liquidated damages to the federal minimum wage rate multiplied by non-overtime hours, plus the overtime hours multiplied one and one-half times the regular straight-time rate. Indeed, if "overtime cannot be said to have been paid unless all the straight time is paid" and "*all* [straight time compensation] means all" and is based on the "regular straight-time rate," not "the statutory minimum wage rate," *Conner*, 22 F.4th at 422, 424-25 (simplified), awarding the product of

these figures would effectively mean Plaintiffs would not receive an amount equal to "unpaid minimum wages" plus "unpaid overtime compensation" because they would not receive the gap in overtime weeks stemming from (1) their regular straight-time rate multiplied by non-overtime hours, minus (2) the federal minimum wage rate multiplied by the same non-overtime hours. (Both Voth's and Murphy's calculations include (2), the sum produced by the federal minimum wage in overtime weeks. Awarding that twice would exceed several members' regular straight-time compensation.) The following liquidated damages totals account for this gap in straight-time compensation:

| Employee | Straight-Time Liquidated Damages |
|---|---|
| Carol Ferguson | $767.37 |
| Gabriel Gasca | $1,521.80 |
| Hugo Aguirre Najera | $704.47 |
| Ignacio Ortiz Sanchez | $1,319.11 |
| Lynda Freeman | $1,105.62 |
| Nannette Lackey | $647.32 |
| Richie Flores | $604.35 |
| Sandy Wayne Smith | $686.65 |
| Sergio Polanco Dominguez | $1,673.30 |
| Tavish Winscott | $244.75 |
| **Total** | **$9,274.74** |

52.    This conclusion is effectively the same as the result in *Donovan*. *See* 689 F.2d at 871-72 & n.3-4 (observing that the employees "worked 8 hours a day, six days a week, from Monday through Saturday" and were not compensated for the overtime on Saturday, kickbacks

in overtime weeks caused the employees to receive "$.38 an hour less" than their regular straight-time rate but not "less than the minimum wage specified in the FLSA," and the court's award of equal amounts of damages and liquidated damages included "[f]ifteen dollars for each overtime workweek" given "the amount of straight time compensation that had been kicked back").

53.    Finally, Defendants note that in resolving the parties' disputes about the collective action notice's contents, the Court rejected Plaintiffs' proposed short-form notice's framing of liquidated damages as "$7.25 for every hour they worked in a pay period they were paid late, or if they worked overtime, full time-and-a-half for that pay period, whichever is more." (*See* Pls.' Mot. Issuance Collective Action Notice at 3, ECF No. 165; Defs.' Mem. Supp. at 3, 5; Op. & Order at 2-3, ECF No. 170.) The Court endorsed Defendants' proposed characterization of liquidated damages as "an extra 50% of their regular wage rate for all hours over 40 in a week," and cited the language in the FLSA's liquidated damages provision in support. (Op. & Order at 2-3.) The Court also stated that Defendants' "proposed language more accurately reflect[ed] the proper calculation of liquidated damages under the FLSA," and that Plaintiffs had thus far presented "no authority for their position that they are entitled to overtime wages and liquidated damages for all hours in the relevant pay period, as opposed to any hours over 40 hours per week." (*Id.* at 2-3.)

54.    At the notice stage, the parties provided only cursory briefing on this legal issue and did not cite case law related thereto. The parties have now presented full briefing and an adequately developed record on this issue. With the benefit of this record and briefing, the Court finds, as a matter of law, that Plaintiffs and the collective members are entitled to the above liquidated damages.

**CONCLUSION**

With respect to Plaintiffs' FLSA claims and Defendants' defenses, the Court makes the findings of fact and conclusions of law stated in this Opinion and Order. The Court will enter a Judgment in Plaintiffs' favor and against Defendants on the claims and for the damages specified herein.

**IT IS SO ORDERED.**

DATED this 25th day of July, 2023.

HON. STACIE F. BECKERMAN
United States Magistrate Judge